Good morning, your honors. My name is Daniel R. Molenski. I represent Maricopa County and chief deputy David A. Henderson. For the balance of my comments, and incidentally, I would like to reserve five minutes, I will refer to my clients collectively as the defendants or I will refer to them by name. I think this case must be reviewed and considered by this panel in light of the fact, and as the evidence showed, that the defendant is not guilty. This case involves a detention officer who knowingly violated a clear and well-established policy of the sheriff's office not to disclose official confidential information. He did this knowingly. How clear was the policy? The policy being, I assume, I assume you're talking about medical privacy? Well, no, the policy is referred to in the record by its specific name as CP2.11. This is a policy, and it's a very general, broad policy, adopted by the sheriff's office for many years, certainly during Gerberi's entire employment. In fact, he was educated in this policy while he attended the police academy. And the sheriff's office elected, rather, the record shows that there are hundreds of different types of documents that the sheriff's office has to deal with. The sheriff's office instead opted for a very broad policy that made confidential all official information or documents that a sheriff's office employee, such as a detention officer, might have access to in the course of his official duties. So the clear policy you're referring to really is not restricted at all to the release of confidential medical information? Well, certainly, as the district court found, the inmate's sick call rosters, which Gerberi took in violation of this policy, were, in fact, prescribed as confidential medical records under Arizona law. So certainly that is true. But the specific policy that Gerberi violated was this general policy, which, again, is very easy to understand. But this policy obviously cannot be in conflict with Arizona statutes. That's true. That's true. And it is not. So to the degree that the policy might have an operation inconsistent with ARS section 23, then 1501, parent 3, parent C, parent II, the policy is inoperative? If in the event there was a conflict between the two, then clearly Arizona statute, Arizona law would trump. No question about that. But, again, this was the decision of the sheriff's office to have this very broad policy. It makes it easy for employees to know, then, that any kind of official information. And the record reflects that Gerberi understood that these inmate's sick call rosters were official information that were provided to him so that he could perform his official duties as a medical escort officer. He violated this policy, this very clear and very well-established policy. Then he disclosed these records in violation, as the district court found, of Arizona statute, which prescribed these inmate's sick call rosters as confidential medical information. I've got the district court order here in front of me. Put my nose in what the district court found that he did in violation of the statute. I think I heard you say he violated the statute. What the district court determined, Your Honor, and this is found in the clerk's record at 126, that the inmate's sick call rosters were, in fact, confidential medical records. And I think that's the reason why I'm asking you to refer me to the portion of the order upon which you're relying. I can, Your Honor, give him just a moment. Thank you. Judge Fletcher, while I'm looking for that, if I could complete the thought as to how I believe this Court must consider this case. Again, we have this violation of this very broad and clear policy. Disclosing records which are prescribed as confidential under Arizona law, as found by the district court judge. Well, that's what, as found by the district court judge. Yes. Please point me to this. I'm sorry, sir. Please point me to the finding of the district judge upon which you are relying. Just to move things along, can you look at finding of fact 14 on page 4 of the order? Your Honor, thank you. I was looking a little further past that. I apologize. Indeed, it is paragraph 14 of 126 of the record. The problem, of course, is that the Court also found there's no reason that plaintiff should have perceived these to be confidential. Your Honor, that is the, well, certainly, as a detention officer, as an officer, Gerberi is deemed to know the law. But if we put that aside. The sheriff's office didn't treat them as confidential. Well, the record doesn't support that finding either, Your Honor. As the Court knows, the record shows that as the internal affairs investigators conducted their investigation, they determined, they were told by people they were interviewed, both the other individuals who were involved in the investigation, and the other individuals who were not. There was an inmate medical escort officer, Officer Walters, who was interviewed, and then also a correctional health services nurse who they interviewed. I believe her name was Wanda LaPointe. Both of them told the investigating officers, in fact, these rosters were treated as confidential, and they were disposed of or shredded at the end of the day. And the investigators testified at trial that they had never been detention officers themselves. They certainly had not been medical escort officers, but they said these interviews convinced them that, in fact, these documents were treated as confidential. Now, to answer your question. It only appears not to have persuaded the district court. That is true. But, Judge Clifton, I think it's important here to understand, too, that the interplay with the well-established sheriff's office policy that I was discussing just a few moments ago, this is a very broad policy. The record reflects CP2.11 that prohibits an employee of the sheriff's office, such as Gerberi, from disclosing official information to accept under certain specified exceptions that were not met here. So certainly, and Gerberi, I should add, testified, again, that he understood that these rosters were official information provided to him to perform his official duties. So, again, he understood, based on this well-established policy, that he was not permitted to – I beg your pardon if I may just get a glass of water. These were – this was official information that he was not permitted to disclose to others without having official permission. But, presumably, he does have authority to disclose it under the Arizona statute if it qualifies under the statute, which I won't try to repeat all the pieces of, but which Judge Fletcher cited. And one of the things that gives me some confusion as I look at the district court's determination, the court makes the point of finding that the disclosures, including the sick call rosters, were made in a reasonable manner under that statute. Well, I believe that's clear error, Your Honor, because that finding by the district court is, of course, internally inconsistent with the court's finding, again, at the record at 126. If you go to paragraph 33, the district court, again, found that Gerberi's disclosures were made in a reasonable manner. But then, again, if you go back to paragraph 14 of the very same order, the district court determined that these rosters, again, included confidential medical information and were, therefore, medical records prescribed as confidential by law. Therefore – Attention works both ways. Why doesn't that lead us to say because the office did not treat them as confidential? We all sign these forms every time we go to the doctor's office, which I don't think anybody reads anymore, so we know that there's a lot of legal protections out there. But is there no sense, given, as I read the district court's findings, that people really thought these were confidential, these weren't the keys to the kingdom? And having said that they weren't treated as confidential, that the plaintiff didn't have reason to think they were particularly confidential, and that the disclosures were made in a reasonable manner under the statute, and then we get to a conclusion that says, but he was going to be terminated anyway, and that doesn't violate the statute. I mean, there seems to be some real tension here, and it can go either way. Either you win completely or a plaintiff wins completely, but I have some trouble understanding how these get reconciled. Well, Your Honor, again, I think with respect to, I think, again, we do, the defendants do disagree with the district court finding with respect to other sheriff's office employees not treating these records as confidential. But if you put that to one side, Gerberi still admitted that he knew and well understood that broad policy prohibiting him from disclosing official information to others outside of the district court. But let me address this if I can at the broad level that you were just describing. And putting to one side whether these are confidential medical records, these are, I think, official records. Yes. And under your description of the policy, he was forbidden to reveal them. That's right. But let me keep going. I'm sorry, sir. Because I understand what the district judge to have held, though, is that the Arizona statute nonetheless allows him to reveal these in a reasonable way, for example, in a whistleblower's situation, which he thought it to be. And the district judge seems to have agreed with Mr. Gerberi on that point. Judge Fletcher, I would disagree. There's no finding to that effect. Finding to what effect? By the district court that it was permitted to disclose confidential medical information of others, even in a whistleblower context. No, I'm at the more general level. I tried to be specific. I'm now not talking about whether or not these are official medical records. I'm merely talking about these as official records not containing medical information. And you're saying that he knew full well, irrespective of whether or not there was medical information, that he was forbidden to reveal them. That's right. And I'm saying that I read the district court judge to have held quite the opposite, that he was protected in so doing under Arizona statute so long as he disclosed them in a reasonable way. And to that degree, in other words, the Saros Office regulation has to give way to the Arizona statute. I see what you're saying, Your Honor. But if that is indeed the case, and I don't believe the district court, certainly there's no specific finding along the lines you suggested. Well, but there is in the sense that the district judge said that he's entitled to reinstatement because of, under the Arizona statute. Well, but then again, that conflicts, though, with the other Arizona statute that prescribes these documents as confidential medical records. And Gerber is saying... She doesn't say actually that's another Arizona statute. She says by law. My guess is it's federal law. I'm not sure. She doesn't say. She just says by law. So, again, we have the law. I believe it's statutory, whether it's federal or Arizona, prohibiting the disclosure of these medical records versus another law that says you can make a reasonable disclosure and not be terminated as a result. But, again, because Gerber disclosed medical records of other people, of these inmates, without permission, certainly that makes the disclosure of information of those inmate sick hall rosters unreasonable, I believe, per se. Certainly there were other methods that Gerber had available to him if he wanted to make this disclosure. The record shows, for example, in December of 1998, Gerber wrote a detailed letter to the sheriff complaining of these very issues that he was concerned about. When he did not get satisfaction from the sheriff, Gerber could have simply attached that letter and another letter to the county attorney or to others, you know, that are permitted to receive such information under the Arizona statute at issue. And that would have been a reasonable disclosure. But where he ran into problems was he violated this very clear, broad, easy-to-understand, well-established policy of the sheriff's office. Point me to this very clear, broad, easy-to-understand policy, because my sense is it probably appears to prohibit him from sending it off to the county supervisors, too. Well, certainly he didn't. What he did was give them to his father. No, I understand that. And, of course, he was not permitted to do that under any circumstances. I'm asking you a different question. I'm sorry, sir. Did you put my nose in the actual broad policy? I mean, it's here in the record. Where is it? Well, certainly there are references to it in 126. I would have to go into the ‑‑ it is referred to as CP2.11. That is the specific policy. I do not have ‑‑ well, for example, paragraph 51 of the record at 126 makes references to this policy. But there are other references as well. Your Honor, I am ‑‑ Maybe when you're sitting down and listening, if you can find it easily. I would be glad to do that. Again, just a parting note here, and then I'm going to reserve the remainder of my time. He did violate this very clear policy, so he certainly knew he wasn't supposed to do it. In disclosing these confidential medical records, he violated the inmate's medical privacy or right to privacy in their medical records in violation of Arizona statute. And then he lied about it repeatedly. And not just at the initial interview, but throughout the investigation process, and even at the time of his pre‑termination hearing, Gerberi was still not telling the truth. I think this case has to be reviewed in that context. I'd like to reserve the remainder of my time, if I may. And if possible, as you're sitting down, if you could find me a copy of this very clear policy so I can read it, I would appreciate it. If it's not in these records, well, then we'll deal with it some other way. Okay. Thank you. Thank you, Your Honors. Good morning. I'm Martin Bin for Chris Gerberi. Our principal issue here is the 1983 issue in what we perceive to be a misapplication of the Mount Healthy Standard. When the court found that there's qualified ‑‑ no qualified immunity, found that it was substantial, that disclosures were a substantial basis for the termination, and then went on to find that he had been fired anyway, that was our problem. From our perspective, we've got one group of ‑‑ single conduct, and it's not some independent basis for terminating Mr. Gerberi. The Mount Healthy case, we had ‑‑ I don't think so, Your Honor. Mount Healthy, we had someone who had an independent basis for being dismissed. We don't really have an independent basis here outside the whistleblower. I mean, the theory of retaliation is that it's for protected conduct. I mean, and then the defendant has the opportunity under Mount Healthy to show, well, it doesn't ‑‑ I mean, even though it was a substantial factor in the termination, there was a I would have done it anyway. The I would have done it anyway in Mount Healthy, though, involved obscene gestures towards girls, and he was ‑‑ other problems with other employees. In this case, we don't have any other evidence that Gerberi did anything outside of the disclosures to warrant the dismissal. Well, sure you do. You have his lying, and you have the fact that he turned over confidential medical records. This is all in the context of the disclosures to begin with. The lying issue is in the initial portion of the investigation, he's brought in under an IA, advised of his rights, and for the first half hour or so denies any involvement. Takes a break, calls the county attorney, his own attorney, comes back and says, guys, I've got to come clean, this is what I did. That's the sum total. Well, I've read the transcript, and I think that's an extremely generous description of what he did. He admitted he was lying, but never mind that. All right. We've got a fact finding by the district court that he would have been terminated anyway. Now, why is that finding clearly erroneous? Well, the would have been terminated anyway, and I think the court's basis was the disclosure to the father. Ultimately, that's what it is, because the other two disclosures, the county attorney testified he was a proper person to receive this information, and he also testified the board of supervisors were the proper parties to receive this. So we're left with the father. The father's the conduit. I mean, at that point Gerberi has taken these documents, which are simply lists of inmates with a little bit of medical information on them. He sits with his father. They make packets. They put the packets together, and dad delivers them to the supervisors and to the county attorney, and dad sends one to the newspaper. What we've got is Mr. Gerberi, Chris, the client, did not know, and I think that's a finding by the judge, that his dad was going to send this to the newspaper. So he's being punished. He's used his father, who is a secretary of the union, and Chris is the union president. Well, that just makes it more sympathetic. But he had no more right to give the stuff to his father than he did to give it to me. I think what we're looking at is, well, to go back to the judge's findings, Chris had no understanding, A, that this was a confidential medical record. I understand that. So he comes in. He sits with his father. This isn't to review a medical record. These are, again, putting together packets. He understood enough to ask for them. Okay. And in today's world, it's sort of hard to believe that anybody would think that medical records aren't confidential. Okay. This occurred in 1999, Your Honor. Look, it's not that long ago. I mean, you just don't go around giving other people's medical records to anybody, do you? No, Your Honor, you don't. Okay. But if I may simply describe what the document was, they have inmates who need to go to sick call. Right. What they do is they print out a list of inmates, and they say, go get these people. And for some of the inmates, on the edge of this document is listed a medical condition. Some of them were serious. One said HIV. Others said runny nose. They didn't all have medical conditions. But that wasn't what Gerberi was interested in. What he was interested in was the date to the right of that that said, how long this person had been in custody before receiving initial medical care. That's the relevant information from Gerberi's standpoint. But he didn't white out the description of the condition. He did not. Yeah. He did not. Yeah. Here's my problem. I mean, I've got problems with both sides of this case, I have to say. Here's my problem with your side of the case. In a sense, it seems pretty, how do I want to say it, in a sort of lay sense, kind of innocent. He's going to his dad for advice. But dad isn't entitled to get the documents in the same way, for example, the county attorney is. Dad sends it off to the newspaper. Well, it's pretty clear that your client shouldn't have sent it to the newspaper. It's also pretty clear, at least it seems to me, that if he gives it to the county attorney, the county attorney is not going to send it off to the newspaper. Giving it to the person not authorized to receive it, although he, I don't think, had the intent that it should have this consequence, results in all of a sudden this stuff is given to a newspaper reporter who's under pretty much any definition of this not entitled to the medical information. That's true. So it makes it difficult, Your Honor. But another fact of this case that the defendants have pointed to repeatedly is this is a, these medical records, it's a huge problem. We've caused potential liability for everyone. The fact of the matter is they didn't even, and this was trial testimony, they didn't warn the newspaper, they didn't try to collect these documents back from the newspaper. They didn't go back to the counsel people to go get them from them. I mean, it wasn't until my opening statement that they went back, and this is years after the fact, to try to collect these documents. The suggestion that this is a huge problem for the sheriff's office from a liability standpoint, I think that's what was shown to be protection. But my problem, again, my problem with your piece of this case is you've got yourself a factual finding by the district judge that Mr. Hendershot would have done this simply because he gave it to the father. And all these other things might have, you know, maybe those contributed, but the truth is that in itself was enough to determine that. How is that clearly erroneous? I mean, I might have thought otherwise. I might have thought, you know, they're very unhappy because he's embarrassed the sheriff's department, and that they're just looking for a little excuse, and this is the excuse. But that's not what the district judge found. No, it's not. Our view is his father is simply a conduit. Of course, it's potentially wrong to disclose to the father what he's doing with his father, simply putting packets together. I mean, this is factual underpinning of this thing. It wasn't, Dad, look at these documents. Dad took a packet and gave it to the newspaper. Well, if he's a conduit, doesn't that cut totally against you? I don't think so, Your Honor. This is sort of making him the vehicle through which this goes. Take it to the county attorney. I would be far more persuaded if he just gave it to his father because his father was his dad, and say, you know, what should I do with this stuff? And his father maybe gives him bad advice or something. But if he's a conduit, that implies to me he gave it to him knowing it was going to go straight. No. I think there's a factual finding that he did not give it to his father knowing he was going to give it to the newspaper. Father was with him in the union. Father is an ex-deputy. Father was an official. The union had been receiving complaints, this is in the record, from their employees to do something about the situation. They're doing it. It's a difficult case, Your Honor, but those are the facts, and that's what I have, and that's what they did. May I switch gears and talk to you a minute about the Arizona statutory issue? Sure. It looks to me like, well, first of all, the Arizona statute doesn't have any analysis built into it. All right. There's no Arizona case on point, so possibly the issue could be certified. But beyond that, Arizona previously and today seems to follow, in general, federal law. Most federal law in a retaliation case incorporates the Mount Healthy analysis. And Mount Healthy makes it very clear that once the district court has determined that there was a substantial, that the protected ground was the substantial reason for the termination, the district court must go on to determine whether the defendant would have done it anyway. And the district court, it seems to me, under the Arizona statute side, stopped short of the third step. It just said it was a substantial reason. But we know what the district court thinks about that, because on the 1983 side, it found that the defendant would have done it anyway. So I put all that out to get your reaction. Well, again, you're correct. We don't have any Arizona guidance in this area. Typically we follow federal laws. Is it the Mount Healthy, or is it more of a Title VII retaliation view? I mean, do we get that last shot at the apple saying we would have done it otherwise? That's the question here. When the court's analysis comes through, she stops or the court stops. Well, what the court sort of ends this in the award in the end by reinstating him to the date of the judgment, which, in fact, was no reinstatement whatsoever and he doesn't get his job back, which was kind of a unique way of dealing with this issue. So I don't know what the court did here. It seemed to me under the Arizona statute, he should have had his job back, been reinstated and gone forward. It seems to me like he doesn't get there, because the district court found that the defendant would have done it anyway. I guess we could. Wait a minute. I'm not sure I understand. I'm looking at paragraph 43. Defendants shall reinstate plaintiff to his position from the date of his termination, July 30, 1999. As I read that, he got his job back. Do I misunderstand? He did not get his job back. Why didn't he get his job back? This looks to me as though he was ordered to get it. And that's what I believed as well. And this took a year to resolve. And I think there's a transcript from November 2 where the judge makes clear what her ruling was. No, he was not reinstated to his position. Because of her analysis under 1983, well, he might have been fired anyway and he released it to his dad. He is only reinstated to this day, which was nothing. I mean, we're here because plaintiff is not reemployed, was not reinstated. I see. I should have read past this paragraph or this order. I'm not surprised it wasn't apparent. If I look to the very end of the order, I guess I see language that suggests that. Did it have any practical effect for plaintiff to give the seniority of any kind? No. I think there was a motion for clarification in the record. That was the first thing we filed. And it took a long time to get that resolved. And when we got the ruling from the court, we still didn't understand. I think speaking for counsel and I, we went back and had a motion for a status conference. And it was after the first notice of appeal had been filed. And we were able to get in front of her, and there is a record, the November 2, 2004 record, of what and why it meant in this case. Going back to Judge Reimer's question, then, if we don't have Arizona guidance, and given that there is Arizona case law in related fields suggesting that Arizona looks to federal law, is there a reason not to look to federal law for this cause of action? I think we don't know what Arizona would do. We're sort of speculating about what the law is in Arizona and how they would do it with this particular case. This particular statute arises out of the whole Employment Protection Act. There are a whole lot of other issues in it as opposed to simply being a retaliation type statute. I'm now puzzling over this. Sometimes oral argument is useful, and it will point to me why I have not fully understood the case. I'm now looking at this page 11. It is further ordered that defendants, Maricopa County, Hendershot, are liable to plaintiff on account for, for wrongful termination and violation of ARS, da, da, da. He shall be reinstated at his position with the effective from the date of his termination. Everything up to that point makes perfect sense. But if, in fact, they violate it, it makes no sense whatsoever that he should not be truly reinstated. But I don't get it. And I gather there's no damage judgment because in the meantime he's making more money. Well, there was no damage judgment. We specifically asked for clarification on that issue, saying what about the seniority, what about all the other incidentals between date of termination and date of judgment. And there was, it was just, no, he doesn't get any of those. But that's moot if my analysis is right. That's true. Okay. Sure, Your Honor. Defendants will go on at length about he was a liar, he was a liar, he was a liar. Fundamentally, yes, he lied for a brief period and came clean. It may be charitable from my perspective, but ultimately that's what the court found. We went through a lot of testimony on this issue. He, the issues that were raised were serious issues from my client's perspective. It was reasonable to do what he did under the Arizona statute. The issues, the real importance of the issue was these inmates not reaching, receiving medical treatment as it exposed other officers to potential health hazards. Typically inmates are screened for diseases. We have any number of tuberculosis, those sorts of things, in the earliest stages of their incarceration. And they weren't, it wasn't happening and the correctional officers felt at risk. And that was why Gerber, the impetus upon Gerber to do something about it. He did act in good faith with this stuff. It was not like he was out taking inmates' medical records and using that against them. This was a good faith attempt to bring this to the attention of the county attorney and to the Board of Supervisors. And that's where we are in the end of this case, Your Honors. It's not an easy case and there are a lot of convoluted facts to it. But what we'd ask is on the 1983 case that the Mount Healthy issue, although she found, yes, there is another reason, from our perspective it's all tied into the one issue. It all relates to the one transaction, which is his whistleblowing activity. You know, he delivers the documents to Dad. And so two of the, as Dad takes it to both the county attorney and to the supervisors, that's okay. But when Dad, unknowing, when my client doesn't know about delivering it to the newspaper, that suddenly is grounds for termination. And from our perspective, it's all, if it's okay for Dad to do two things and do something that we couldn't foresee or didn't know about, certainly our client, Mr. Gerber, that shouldn't be held against me, should not be dismissed on that basis. There is no independent reason other than this transaction. I mean, he was a good employee. He was not, like the other cases, someone who had other issues facing him. So on that, if there are any other questions, unless there are any other questions, I'll go ahead and sit down. Thank you. Thank you for your argument. Very briefly, Your Honors, this is not a whistleblower case. Arizona has a whistleblower statute. The district court granted the defendant's summary judgment on that. That judgment was not appealed from. Turning back to the Arizona statute that is at issue, ARS 23-1501 and so forth, again, that statute allows disclosure in a reasonable manner. Judge Fletcher, you asked before, what is the language of that general policy? And you can find it, and I will read it into the record if the court would like, but it's in the defendant's. Is it not already in the record? It is. Okay. And, in fact, it's in the defendant's third appeal brief at page 9. The policy says much of the official business of the office is confidential. What color is that brief? I've got a pink one. I've got a blue one. I've got a gray one. Your Honor, I have to confess, my copy is white, so I apologize. But, again, it's the third cross-appeal brief. And it's on page what? 9. The red one. The red one, Your Honor. Okay, I've got it. And, again, it states much of the official business of the office is confidential. Employees shall only discuss or disclose official information as follows. One, as required by law. Two, with persons authorized to receive the information. And, three, as directed by a supervisor. Gerber received training in this policy, which had been in existence throughout his entire employment by the sheriff's office. Now, does the Arizona statute trump this provision, this policy? Yes. But does the Arizona statute at issue trump other Arizona statutes? The question came up during my initial remarks whether the district court's ruling that the inmate medical records are confidential medical records, the disclosure of which is prescribed by law, you know, whether that was federal or state law. In fact, this is covered in my first appeal brief at pages 37 and 38. In fact, there were Arizona statutes. So we have an Arizona statute that prohibits firing of an employee who makes a reasonable disclosure. And then we have another Arizona statute that prohibits the disclosure of inmate sick call, well, confidential medical records, which included, as the district court correctly found, these inmate sick call rosters. So, again, you can make under the statute at issue, you can make a reasonable disclosure, but reasonable does not include violating other Arizona law. And that's what Gerberi did wrong here, in addition to his repeated lies throughout the internal affairs investigation and thereafter. But what's realistically at stake from your standpoint in your appeal, given that he does not have a job and given that there were no damages awarded as a result of the district court's finding of the violation of the Arizona statute? So what's realistically at stake from your standpoint? Well, Your Honor, first of all, first and foremost is we have an officer here who lied. Police agencies, like the Sheriff's Office, have a Why are you the appellant? Sounds like you walked away from the activity in the district court as the winner. Well, because the main concern is terminating an officer who admittedly lied repeatedly, who violated well-established, well-known policy of the Sheriff's Office, breaking the law in the process. That is, the statutes that prohibit the disclosure of confidential medical information doing these things, which the defendants assert was entirely proper under these circumstances. And then being held by the district court to have violated the Arizona statute 23-1501 at issue. That's the concern the defendants have. You know, a proper termination decision made for the proper reasons, but yet still being found, we believe, incorrectly so as a matter of clear error in violation of the statute. That's what brings the defendants here as appellants. Just a matter of principle. Well, but a matter of precedent as well, Your Honor, because if the Sheriff's Office cannot discipline, and that includes termination, officers who lie, the Sheriff's Office and, for that matter, police agencies throughout this circuit face, I think, difficult days. But if you win here, I don't think you're going to win on that ground. You're going to win on the ground that Mount Healthy applies, and you're going to get transferred into the state cause of action, that he would have been fired anyway for revealing the information to the father. I think that's right, but I wanted to answer. Lying, you're not going to get out from under that part of the case. That's neither here nor there. I agree. But I wanted to answer Judge Clifton's question as to, well, why are we appealing? And that is why. I'd be glad to speak to the issue of reinstatement if you'd like to entertain a minute or two of that. I don't think so. Okay. I thank you, Your Honors, very much. Thank you. The matter just argued will be submitted. Do you want to take a break or do you want to keep going? I'm okay. Your choice. We'll keep going. Do you want to take a break or keep going? Keep going. Keep going. Sorry. All right. Well, next to your argument in Bronte.
judges: Rymer, W. Fletcher, Clifton